# Richmond

## JULIAN D. STEELE V. MARY STEELE CROCKER.

January 15, 1951.

Record No. 3724.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*J. Sloan Kuykendall* and *Henry H. Whiting*, for the plaintiff in error.

*H. R. Kern, Jr.* and *Harrison, Benham & Thoma*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Mrs. Mary Steele Crocker, while riding as a guest in an automobile owned and operated by Julian D. Steele, was severely injured when that automobile collided with another motor vehicle. In an action to recover damages for her injuries, Mrs. Crocker obtained a verdict and judgment for $10,000.

The plaintiff in the court below, Mrs. Crocker, 33 years old, a resident of Maryland, is the daughter of Julian D. Steele, hereinafter referred to as the defendant. She was on a visit to the home of her parents, a few miles south of Winchester, Virginia. She had one young child, was expecting the birth of another, and desired to be near her doctor whose office was in Winchester.

On February 4, 1948, Steele took his wife, Mrs. Crocker, and the latter's little girl by automobile to Winchester. The purpose of the trip was to enable the Steeles to purchase some groceries and have Mrs. Crocker consult Dr. Gibson, a pediatrician. After they had accomplished their purposes at Winchester, they started at 11:00 a. m. on the return trip home. En route their car, driven by Steele, had a collision with another automobile on the extreme eastern side of a three-lane highway,—U. S. No. 1—in Frederick county, Virginia. The highway at that point runs generally north and south, and has a hard surface 28 feet in width. At the time of the collision, a little snow was falling and visibility was poor. The road was covered with snow and its surface very slippery.

Steele was driving his car in a southerly direction. He approached a hill which ascended a distance of 1,500 feet from a concrete bridge. Mrs. Crocker was seated on the front seat of the car and Mrs. Steele and the little girl on the back seat. When his car reached the bridge at the bottom of the hill, Steele saw three snow plows, in tandem formation, proceeding up the hill in front of him. They were engaged in pushing snow from the road to its west shoulder. The first snow plow, the one nearest Steele, was partly in the right lane of traffic and partly on the west shoulder of the road. The second was about half way up the hill and occupied the right lane, the southbound lane, and the third or front snow plow was in the center lane of traffic. Steele proceeded up the hill at 35 or 40 miles per hour. He pulled over to his left, passed the first two snow plows safely. He then turned further to his left over into the east lane, the lane for northbound cars, and passed the third or front plow when he was within approximately 50 feet of the crest of the hill. After he had passed the third snow plow, he observed a car approaching from the south in the northbound lane of traffic. He turned his car towards his right side of the road. The car immediately began to skid, got out of control, turned a complete circle,

and struck the northbound car which had come to a stop on the eastern shoulder of the road.

James Lewis, the driver of the approaching car, said that he was driving slowly towards the north in the northbound lane of traffic, with his two right wheels on the shoulder of the road, because of traffic conditions; that he couldn't see over the hill and around the road as it curved to his right; that he first saw Steele's car when it was five car-lengths ahead of him, approaching in the third lane, the northbound lane of traffic; that when Steele got probably about three car-lengths ahead of him, the former's car began to skid; that he, Lewis, drove completely to the eastern shoulder of the road; that Steele's car continued forward, hit the left fender of his car, turned around in the middle of the road, came back, struck his car on the side, tipped over on to its side, and slid into the center lane. Two passengers in the car driven by Lewis testified to the same effect.

Mrs. Crocker sustained twelve fractured ribs, a compression fracture of the twelfth dorsal vertebra, a fracture of the right clavicle, cuts, contusions, and bruises on her hips and knees, and a punctured lung. She was taken to a hospital in Winchester where she remained until February 28th, and was thereafter given bed care at her father's home, with a registered nurse in attendance for several months. Her hospital and medical expenses amounted to $3,488.11.

Dr. Riley testified that upon the admission of Mrs. Crocker to the hospital, she was manifesting shock and a lot of pain. He called in the late Dr. P. W. Boyd to see her, because of the extreme nature of her injuries. She was pregnant at the time. As a result of the extreme pain which she suffered for many days, she was subject to uterine contractions which required "frequent hypodermics of different types of medication" to prevent a threatened miscarriage.

Dr. B. S. Bennett, an orthopedic physician, examined Mrs. Crocker on May 7, 1949, sixteen months after the accident, and on November 21, 1949, the day before the trial of this case, twenty-one months after the accident. He said her

condition was then "static," and there had been no essential change between his two examinations. He described her injuries in detail, stating that she had a deformity of the back which was curved in two directions, and a prominence of her right clavicle where the bone had been fractured. She required a surgical corset for the support of her back. She walked with a limp, which necessitated her wearing a specially constructed elevated shoe. He was unable to determine with any degree of certainty "when, if at all," she could dispense with those supports. He found the "residuals of her injuries" still present, properly healed, but with the deformities mentioned, and also some evidence of an arthritic condition in the involved vertebra. In explanation of the "residuals of her injuries," he said, "There is a curve in the back, there is a change in the posture, a change in the gait, deformity of the clavicle associated with pain, and the whole body mechanics of walking are altered by the change in the curve in the back from what they normally would be."

Mrs. Crocker testified that all she remembered of the accident was that as they were driving along, she saw some snow plows ahead of her; that her father pulled to his left to pass them; and that as his car started to skid, she then saw the car with which it immediately collided. She was familiar with the highway in question, and knew her father was driving without chains.

Mrs. Crocker said her injuries had caused her extreme pain for many weeks; that she still had great pain, discomfort in her back, and was unable to sleep on her right side. She had trouble getting up when she was lying down, couldn't do any lifting, couldn't bend without her brace, became easily tired, and couldn't walk without pain. She had been unable to carry on her household duties and take care of her children without the employment of help.

Mrs. Julian Steele, the wife of the defendant, did not recall anything that happened, except seeing the snow plows proceeding slowly up the hill, and her husband pull his car over to his left to pass them.

There was no contradiction of any of the testimony of the physicians or Mrs. Crocker.

The defendant, Steele, said that, at the time of the accident, a light snow was, perhaps, falling, the roads were covered with snow, and he had no chains on his car. The road upgrade didn't seem to him to be bad, and he had had no trouble during that morning. He saw the three snow plows, and explained the accident as follows:

"After I passed the last snow plow that threw me over into the left-hand lane going south, and I saw a car coming up that lane, and I started to pull back for the right-hand side of the road, and my car went into a—started to skid and was out of control."

He "thought" he was 75 feet ahead of the last snow plow, travelling about 30 miles an hour when he turned to his right, and his car started to skid. He had no idea how far it skidded before it hit the northbound automobile.

Both at the completion of the plaintiff's evidence and the conclusion of all the evidence, the defendant moved to strike the plaintiff's evidence on the ground that even if it showed Steele was guilty of gross negligence, Mrs. Crocker was guilty of contributory negligence as a matter of law, because she failed to remonstrate or caution her father as to his course of action. The motions were overruled.

The court gave six instructions to the jury. In one they were told that the defendant was guilty of gross negligence under the circumstances, and unless they believed from the preponderance of the evidence that the plaintiff was guilty of contributory negligence, as defined in other instructions, they should find their verdict for the plaintiff. The other instructions related to the question of contributory negligence and the amount of damages the plaintiff was entitled to, if any, not in excess of the sum of $25,000, the amount sued for, taking into consideration the temporary or permanent character of her injuries, and the effect upon her health and the performance of her duties.

There are fifteen assignments of error involving the sufficiency of the evidence to sustain the verdict and the grant-

ing and refusal of instructions. The principal questions involved, however, are whether defendant was guilty of gross negligence as a matter of law, whether the plaintiff was guilty of contributory negligence as a matter of law, and whether there was any proof of permanent injuries. These will be taken up in order.

Negligence, contributory negligence, and proximate cause are ordinarily questions for the jury. *Spence* v. *American Oil Co.*, 171 Va. 62, 197 S. E. 468, 118 A. L. R. 1120; *Carroll* v. *Miller*, 175 Va. 388, 9 S. E. (2d) 322; Vol. 7, Digest of Va. & W. Va. Reports, Michie, Negligence, sec. 70 *et seq.*; Vol. 5, Permanent Supplement of same digest, sec. 70, *et seq.*, and cases cited.

If reasonably fairminded men may differ as to the conclusion of fact to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony, a jury is the proper tribunal to decide the question of negligence, ordinary or gross. *Thornhill* v. *Thornhill*, 172 Va. 553, 2 S. E. (2d) 318. But where fairminded men cannot differ as to the conclusion, it becomes a question of law for the court. *Drumwright* v. *Walker*, 167 Va. 307, 189 S. E. 310; *Lennon* v. *Smith*, 173 Va. 322, 2 S. E. (2d) 340; *Smith* v. *Turner*, 178 Va. 172, 178, 16 S. E. (2d) 370, 136 A. L. R. 1251.

When the facts are undisputed or conclusively proved, negligence becomes a question of law. "Whether a negligence case should be submitted to a jury or determined by the court must always turn on the peculiar facts in the particular case." *Virginia Elec., etc., Co.* v. *Wright*, 170 Va. 442, 196 S. E. 580.

There are no conflicting facts as to the negligence of Steele. The proximate cause of the collision of the cars is undisputed. Immediately prior to the collision, the defendant was overtaking another vehicle on a curve, proceeding in the same direction upgrade towards the crest of the hill, with his view obstructed by weather and topographical conditions. Nevertheless, he drove his car into the extreme left lane of a three-lane highway. He could not see, and did not see,

the approaching car until he was on or near the crest of the hill, at which time, according to his own evidence, he was in the eastern lane, 75 feet in front of the snow plow in the center lane. In making any turn he might have reasonably expected his car to skid under the circumstances existing.

Admittedly, the defendant was guilty of at least four acts of reckless driving. He violated section 46-209 (2) of Code of 1950, as he passed the last snow plow, proceeding in the same direction, when his view was obstructed. He violated the same section when he passed it on a curve. He violated section 46-222 (2) by moving from the center lane of traffic without first ascertaining that the movement could be reasonably made with safety, and fourthly, he violated sections 46-222 (1 and 3) and 46-228 by driving upon the extreme left traffic lane of a three-lane highway, under the circumstances then existing. He ignored the statutes and all of the ordinary rules of safety. As a result, he suddenly found himself in the path of an oncoming automobile. The events which followed were due to a reckless disregard of his own safety and the safety of his guests. We cannot believe that reasonable and fairminded men may differ as to whether he was guilty of gross negligence.

Here we have no question of mere inattention or inadvertence in driving on the wrong side of the road; but the wilful and intentional conduct of a driver who knew, or ought to have known, that his conduct might well result in disaster. For the sake of saving a few moments, he intentionally drove his automobile, without necessity, from a safe place behind the snow plow, into a position of danger under extra-hazardous conditions then prevailing, with a total and culpable disregard of the ordinary rules of safety and in a flagrant violation of the statutes relating to the operation of motor vehicles. *Collins* v. *Robinson*, 160 Va. 520, 169 S. E. 609; *Waller* v. *Waller*, 187 Va. 25, 46 S. E. (2d) 42.

The question of the contributory negligence of the plaintiff was submitted to the jury under two instructions.

They were told that if they believed from a preponderance of the evidence that the plaintiff at the time she saw or, under the circumstances, reasonably should have seen that Steele was about to pass the last snow plow by driving in the left-hand traffic lane, and "failed to warn Steele of the danger and to protest against such act and that such failure on her part constituted a proximate cause of the collision," they should find for the defendant.

The defendant has no just cause to complain of either of the instructions. They were highly favorable to his theory of the case.

■ There is no evidence that Mrs. Crocker saw or knew that Steele was going to attempt to pass the last snow plow by going into the northbound lane of traffic, in sufficient time to have made an effective objection. Steele did not pull over into the extreme east lane until he was about 50 feet from the crest of the hill. Up to that time he had had no trouble, and Mrs. Crocker had a right to believe that her father would drive safely until it became plain that her trust was misplaced. He did nothing to indicate that it was his intention to go into that lane and up to the moment he drove into it, he was safe in the middle lane. Driving at 30 miles an hour and suddenly making a turn to the left gave his passenger little time to remonstrate. After he got into the lane it was too late to protest. Remonstrance might have resulted in more harm than good by creating hesitation or indecision as to his course. It is one thing to warn a driver of a danger unknown to him, and quite another to give directions when the danger is already imminent. One may prevent an accident, the other may tend to create an additional hazard.

In *Norfolk, etc., R. Co.* v. *Wellons*, 155 Va. 218, 224, 154 S. E. 575, we said:

■ "The guest should not undertake to drive and may trust the driver until it becomes plain that such trust is misplaced."

In *Mize* v. *Gardner Motor Co.*, 166 Va. 415, 419, 186 S. E. 108, it is said:

"The difference in the duty of a passenger and that of a driver arises by reason of the fact that the driver has physical control of the car. Ordinarily, the passenger has no duty to direct and control the driver unless it is obvious that the driver is taking no precautions for their safety. If there is no apparent danger in the manner in which the driver is operating the car, the passenger is not required to interfere."

In *Remine* v. *Whited*, 180 Va. 1, 21 S. E. (2d) 743, we upheld a verdict where the jury found that a guest was not guilty of contributory negligence for failing to warn her driver of a car approaching from a side road when the guest had every reason to believe that the driver saw it. Conditions under which, in such circumstances, a defense of contributory negligence can be sustained have been frequently stated and restated by this court. "When a person has observed a dangerous situation of which the driver is apparently unconscious, it is his duty, if he is so situated that he can readily do so, to call the driver's attention to it; and, if he fails to do so and is injured as a result of such failure, he is guilty of negligence." *Supra*, 180 Va. page 8.

The defendant cites and relies upon a number of cases, many of them railroad crossing cases, each of which may readily be distinguished by their facts and circumstances from the present case.

In railroad cases, it has been generally held that it is the duty of the guest, as well as the driver of an automobile, to look and listen at railroad crossings.

In *Butler* v. *Darden,* 189 Va. 459, 53 S. E. (2d) 146, the driver approaching a railroad crossing, said he did not look out for an oncoming train until too late to stop. Both the driver and his passenger were familiar with the crossing. Neither saw the train until their automobile was on the track, and not until then did the guest give warning of the train. The railroad track was a signal of danger to both. All that was visible to the driver was equally so to his passenger. Neither took any precaution for their safety.

In *Sutton* v. *Bland*, 166 Va. 132, 137, 184 S. E. 231, the

negligent acts of the driver of the car and the hazardous circumstances under which he was operating were clearly apparent to his guests, and they made no protest.

■ We think there was ample evidence for the jury to find that under the circumstances here Mrs. Crocker was not guilty of contributory negligence.

The defendant does not attack the amount of damages awarded as being excessive. He contends that there was no proof of permanent injuries, and that the instructions should have related to temporary injuries alone.

The case of *Chesapeake, etc., R. Co.* v. *Folkes*, 179 Va. 60, 67, 18 S. E. (2d) 309, is directly in point on this question. There the evidence showed that at the trial of that case, approximately seventeen months had elapsed since the plaintiff had been injured. Mrs. Folkes was still under medical care and suffering from an injury to her back, designated as a low back strain. She was wearing a special corset which braced her back. She had endured almost continual suffering from the time of the accident. She had been confined some weeks to her bed, and had incurred expenses amounting to $400. Her physicians said she might get over her injuries, or might have trouble all the rest of her life. She asked for a verdict of $15,000 and was awarded $3,000. We approved that award.

■ Here, Mrs. Crocker was injured twenty-one months before the trial of her case. She was still under medical care, and was still suffering from injuries to her back, and other portions of her body. "Her whole body mechanics of walking" were altered by the curve in her back. She still found it necessary to wear a specially constructed shoe, and a surgical corset, and it was uncertain whether she would ever be able to dispense with such supports. She had endured a long period of pain too. She was confined several months to her bed, and was still unable to perform her usual duties. Her expenses incident to her injuries amounted to more than $3,000. At the time of the trial, there had been no essential change in her condition for a year and four months. She asked for damages in the sum of $25,000.

The jury awarded her $10,000. That amount was not excessive. Larger sums have been awarded for lesser injuries.

The remaining assignments of error are so related in point of fact and law to the matters discussed, that we do not believe it would be helpful to consider them.

There is ample evidence to sustain the verdict of the jury. We find no reversible error in the instructions given or refused. On the whole case, the defendant has had his day in court and a fair trial. The judgment of the trial court will be affirmed.

*Affirmed.*